**Jack FLETCHER, Petitioner,**

v.

**WARDEN, Respondent.**

No. 78–3238.

United States District Court,
D. Kansas.

Jan. 10, 1979.

Jack Fletcher, pro se.

James P. Buchele, U. S. Atty. for Kansas, Topeka, Kan., for respondent.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

Jack Fletcher, a prison inmate, has filed with the Clerk of this Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 and has been granted leave to proceed *in forma pauperis.* Having examined the petition and accompanying materials, the Court finds as follows.

Petitioner is incarcerated by reason of his conviction of a criminal offense against the State of Delaware. He is presently confined in the United States Penitentiary, Leavenworth, Kansas, pursuant to a contract between Delaware officials and the Attorney General of the United States as authorized under 18 U.S.C. § 5003.

Petitioner does not attack his conviction or sentence. Rather he objects that his transfer to a federal institution without a prior hearing is violative of federal statutory and constitutional law. More specifically, he asserts that 18 U.S.C. § 5003 authorizes the transfer of state prisoners to federal custody only upon a showing that the prisoner is in need of specialized treatment unavailable in the state system, and that due process requires a hearing on that issue prior to such a transfer.

The type of relief desired is not specified, but it appears that petitioner seeks a writ of habeas corpus directing his return to the Delaware prison system.

For purposes of determining whether this *pro se* petition states a viable claim, all well-pleaded facts are regarded as true. Furthermore, the allegations of a *pro se* pleading are to be measured by a less stringent standard than a formal pleading drafted by an attorney, *Haines v. Kerner,*

404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Nevertheless, even applying this leniency to petitioner's application, the allegations that a nonconsensual transfer is violative of due process rights do not state a claim upon which relief may be granted.

The issue of whether prisoners may be transferred from one institution to another without a due process hearing has given rise to conflicting opinions among the circuit courts. *See McDonnell v. United States Atty. Gen.,* 420 F.Supp. 217 (E.D.Ill. 1976) (and cases cited therein at 220). However, in the companion cases of *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the United States Supreme Court appears to have resolved this conflict.

In *Meachum v. Fano* the Court held that the Due Process Clause of the Fourteenth Amendment did not entitle a duly convicted state prisoner to a hearing before an interprison transfer within the Massachusetts prison system. The Court reasoned that absent a state law or practice conditioning such a transfer on proof of misconduct or other specified events, there was no protectible "liberty" interest within the meaning of the Due Process Clause.

In *Montanye v. Haymes,* the Court held that as long as the conditions or degree of confinement to which the prisoner is subjected are within the sentence imposed upon him and are not otherwise violative of the Constitution, the Due Process Clause does not require hearings in connection with transfers whether they be labeled disciplinary or punitive. The rationale of the Court is more fully expressed in the following excerpt from *Meachum v. Fano, supra* :

"The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison, if, as is likely, the State has more than one correctional institution. The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.

Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules," 427 U.S. at 224–225, 96 S.Ct. at 2538.

Although these cases involved the transfers of inmates within state prison systems, the principles enunciated therein are equally applicable to the transfer of a state inmate to an institution in the federal prison system. *See Walker v. Hughes,* 558 F.2d 1247 (6th Cir. 1977); *Curry-Bey v. Jackson,* 422 F.Supp. 926 (D.D.C.1976); *McDonnell v. United States Atty. Gen., supra.* Absent any Delaware or federal law or practice conditioning transfers upon proof of misconduct or other specified events, petitioner has no federal due process right to a pretransfer hearing. It follows that in order for petitioner to successfully maintain his challenge despite the controlling force of *Meachum v. Fano* and *Montanye v.*

*Haymes,* he must demonstrate that his transfer without a hearing was not within the discretion granted by law to the responsible state or federal prison officials.

Petitioner advises the Court that Delaware law confers discretion upon its prison authorities to transfer a state prisoner without notice and in spite of his objections or preferences. However, petitioner asserts that his transfer was outside the authority granted to the Attorney General by federal law. He argues that the relevant statute requires a showing that specialized treatment is needed by the prisoner and is available only in the federal system as a condition precedent to his transfer.

The statute in question, 18 U.S.C. § 5003, pertinently provides:

> (a) The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory: *Provided,* That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

There is a dearth of case law construing this statute with respect to the necessity for pre-transfer hearings. In *Lono v. Fenton,* 581 F.2d 645 (1978), the Seventh Circuit Court of Appeals held that the only authorized purpose for any transfer under § 5003 is the provision of specialized treatment, and that a hearing is necessary to determine if this purpose would be served. The court based its opinion upon the "unique" terminology used—"penal and correctional institutions" are referred to as "treatment facilities." The court also relied upon the legislative history which it said "totally bears out our interpretation of the statute." That legislative history, as recounted by the *Lono* court, is quoted here:

> The draft legislation originated in the Department of Justice and was introduced in the Senate at the request of Deputy Attorney General Peyton Ford, who explained in a letter to Senator Pat McCarran, Chairman of the Senate Judiciary Committee, the reason for the proposed legislation:
>
> > Frequently, State officials request the Bureau of Prisons to undertake the custody, treatment, and training of State prisoners where specialized types of institutions and training programs are indicated but not available to the States. These requests usually relate to juveniles, concerning whom many of the States are without satisfactory institutions and training programs.
>
> S.Rep.No. 978, 82 Cong., 1st Sess. 2 (1951).
>
> The Senate passed the bill as drafted by the Department of Justice, without relevant amendment and without debate. In introducing the bill prior to its passage, Senator McCarran explained that it would authorize federal custody of state prisoners "under certain conditions in a limited category of cases, . . . ." 97 Cong.Rec. 13543 (1951). The House Judiciary Committee then considered the bill and recommended passage in a report which again emphasized that its purpose was to allow use by state prisoners of specialized programs not available within the state prison systems. Juveniles and drug addicts were noted as examples of the prisoners for whom states had requested such transfers. H.R.Rep.No. 1663, 82d Cong., 2d Sess. 1 (1952) reprinted in [1952] U.S.Code Cong. & Admin. News, pp. 1420, 1421. The House Report contains the following statement in its discussion of the "Contents" of the bill:
>
> > The proposed legislation restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment. The term "treatment" as used in this bill, in addition to its ordinary meaning of providing medical care, is also meant to include corrective and preventive guidance and training as defined in the Youth Corrections Act (sec. 5006g, title 18, U.S.C.).

H.R.Rep.No. 1663 at 2, [1952] U.S.Code Cong. & Admin.News, p. 1421. The bill subsequently passed the House without debate or amendment. 98 Cong.Rec. 4801 (1952).

The published decision in *Lono* was rendered on rehearing *en banc* and is a complete turnabout from the original opinion of the court. The initial decision has evidently not been published. However, it was reported in Volume 23 of the Criminal Law Reporter at page 2018 (2/21/78). The Honorable William J. Bauer, Circuit Judge, authored the opinion of the original panel and the dissent to the decision on rehearing, *Lono v. Fenton, supra,* at 648. We find Judge Bauer's reasoning to be the more persuasive and adopt it as the basis for dismissal of this action. In accord is *Shakur v. Bell,* 447 F.Supp. 958 (S.D.N.Y.1978), see also *United States ex rel. Gereau v. Henderson,* 526 F.2d 889 (5th Cir. 1976).

We fully agree with Judge Bauer that "There is simply nothing in the language of the statute itself that 'restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment'." The statute merely authorizes federal officials to contract with the states "for the custody, care, subsistence, education, treatment and training" of state prisoners. The only conditions Congress expressly imposed upon the Attorney General's authority to enter such contracts are that the Director of the Bureau of Prisons certifies that "proper and adequate treatment facilities and personnel" are available and that the United States be reimbursed for all costs or expenses involved. The majority in *Lono* "strains" the language of the statute in construing the certification requirement as a limitation on the purposes for which prisoners may be transferred. Thus, we conclude that there is no support for petitioner's claim that § 5003 transfers are restricted to prisoners needing special treatment.

Nor is this Court persuaded that such a restriction must be read into the statute because of its legislative history. As explained by Judge Bauer in dissent:

" . . . [T]he apparent discrepancy between the clear language of the statute and its legislative history results from the fact that the committee reports on which Lono relies were more concerned with explaining the need for enacting the legislation than the substance of its uncontroversial mechanics. It seems likely that Congress intended the Bureau to have whatever authority it needed to deal with the particular historical problem that prompted the bill's introduction without unduly restricting the Bureau's administrative discretion in determining the types of prisoners it would contract to receive and the purposes for which it might assume federal custody over state prisoners. In any event, the Bureau's administrative construction of the act as not limiting the Bureau to accepting only those prisoners in need of specialized treatment is "entitled to great weight and should be followed unless there are compelling indications that it is wrong." *Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975). The Bureau, after all, itself drafted this statute, prompted its introduction in the Senate, and pressed it through Congress without amendment or, indeed, much debate. Moreover, upsetting the Bureau's settled and previously unchallenged administrative construction of the statute now—over 25 years after its enactment—jeopardizes longstanding contractual relationships with many States," *Lono v. Fenton, supra,* at 649 (dissenting opinion).

Section 5003 is included in the general provisions which precede the Federal Youth Corrections Act, 18 U.S.C. § 5005 *et seq.* Neighboring sections of this Act have been amended or repealed, *e. g.,* §§ 5005 and 5007. Section 5003 was amended in 1965 to define the term "State" as including "any State, territory, or possession of the United States, and the Canal Zone." If Congress were at serious odds with the construction given the statute by the Bureau of Prisons they surely would have made some change in the statutory language over the interven-

ing quarter of a century since its passage. *See United States v. Stowe-Woodward, Inc.,* 306 F.2d 678 (1st Cir. 1962), *cert. denied* 371 U.S. 949, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963). We are faced with a long-standing and consistent interpretation by the agency charged with administration of the statute and that interpretation is entitled to strong judicial deference. *Hiatt Grain and Feed, Inc. v. Bergland,* 446 F.Supp. 457, 475–476 (D.Kan.1978); *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 274–275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Save Our Invaluable Land (SOIL), Inc. v. Needham,* 542 F.2d 539 (10th Cir. 1976), *cert. denied* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792.

We do not controvert that the legislative history might suggest that Congress' understanding as to the manner in which the Bureau of Prisons would implement the statute was that only those state prisoners in need of specialized treatment would be housed in federal institutions. However, that understanding was not incorporated into the language of the statute and has not been added in the twenty-six years since its enactment. *Lono v. Fenton,* No. 77–1141 (7th Cir. February 21, 1978, unpublished) (vacated on rehearing).

We conclude that the language of 18 U.S.C. § 5003 is plain and unambiguous on its face and should supersede any seemingly contradictory legislative history. Accordingly, we hold that petitioner was not entitled to a hearing prior to his transfer from Delaware to the federal prison in Leavenworth under either the Due Process Clause or 18 U.S.C. § 5003.

The motions to include three other prisoners as petitioners in this suit are denied due to our disposition of the case and the fact that the three movants have not submitted proper motions for leave to proceed *in forma pauperis* or paid the necessary fee.

For the above reasons, it is

ORDERED that the motions to add Richard Parker, Gary Watson, and Charles Live-

ly as petitioners in this action be denied; that this action be dismissed and all relief denied; and that the Clerk transmit copies of this Memorandum and Order to petitioner and to the Office of the United States Attorney for the District of Kansas.